**TELEMAC CORPORATION, Plaintiff,**

v.

**US/INTELICOM INC., Defendant.**

**US/Intelicom Inc., Counter-claimant,**

v.

**Telemac Corporation, Counter–Defendant.**

**No. C99–05026.**

United States District Court,
N.D. California.

Dec. 26, 2001.

Roger L. Cook, Guy W. chambers, William T. Gallagher, Laurie H. Van Loben Sels, Townsend & Townsend & Crew, LLP, San Francisco, CA, Eric Landau, Shawn Harpen, Christensen Miller Fink Jacobs Glaser Weil & Shapiro, LLP, Los Angeles, CA, for plaintiff.

Roger R. Wise, Ian R. Barrett, Pillsbury Winthrop LLP, Los Angeles, CA, Nagendra Setty, Mitchell G. Weatherly, Needle & Rosenberg, P.C., Atlanta, GA, Matthew P. Vafidis Holland & Knight LLP, San Francisco, CA, James H. Beusse, Beusse Brownlee & Bowdoin, Orlando, FL, Jackson O. Brownlee, Douglas Bowdoin,

Beusse Brownlee Bowdoin & Wolter, P.A., Orlando, FL, for defendant.

### FINDINGS OF FACT AND CONCLUSIONS OF LAW

WILKEN, District Judge.

## I. FINDINGS OF FACT

### A. BACKGROUND

(1) This is a patent infringement action in which Plaintiff Telemac Corporation (Telemac) asserts that Defendant US/Intelicom, Inc. (USI) infringed claims 7, 10 and 11 of Telemac's U.S. Patent No. 5,577,100 ('100 patent). In view of this Court's April 27, 2001 "Order On Cross–Motions For Summary Judgment," the only remaining issue concerns the "communication means" claim element. On May 29 and 30, 2001, this Court held a trial to resolve whether USI or its licensees have or have had "communication means for selectively establishing a communication link" within the meaning of independent claim 1 of Telemac's '100 patent and, if so, what measure of damages Telemac is entitled to recover for infringement by USI of dependent claims 7, 10 and 11 of Telemac's '100 patent. (May 11, 2001 "Stipulation And Order Concerning Trial").

(2) The '100 patent discloses and claims technical improvements in the field of wireless telephone technology. Conventional cellular phones operate on a credit system similar to a credit card. The cellular phone carrier permits customers to use its airwaves and amass charges. At the end of the month, the carrier sends a bill for the amount of the charges. This system operates on the assumption that the customer is creditworthy, and thus excludes those with poor credit ratings. (April 27, 2001 "Order On Cross–Motions For Summary Judgment", p. 2).

(3) Telemac is a Delaware corporation with its principal place of business in California. When the company was formed in the early 1990's, it focused on the rental cellular phone market and sought to find a way to minimize the credit risk for the rental provider. Telemac developed a cellular telephone accounting system, described in U.S. Patent No. 5,325,418 ('418 patent), which allows phones to record the phone number and call duration for each call as it is made. When the customer returns the phone, the rental provider uses the stored information to prepare and present a bill in order to receive immediate payment. (April 27, 2001 "Order On Cross–Motions For Summary Judgment", p. 2–3; TEx. 5 [1], '418 Patent).

(4) In 1992, Telemac began work on the switch-independent debit telephone technology which is the subject of the '100 patent. This technology was intended to reduce further the credit risk to the cellular airtime provider by permitting prepayment by customers. Telemac developed a mobile phone system that: (1) stored rate information for different types of calls within the telephone, (2) used a complex billing algorithm stored within the telephone to apply the appropriate rate to each call and determine the actual charges for the call, and (3) used a debit account stored within the telephone to subtract charges for the call from a prepaid account amount. (April 27, 2001 "Order On Cross–Motions For Summary Judgment", p. 3; TEx. 1, '100 Patent).

### B. '100 PATENT'S "COMMUNICATION MEANS"

(5) The debit telephone system described in Telemac's '100 patent features a system provider with one or more computers, known as "host processors." The host processors perform programming, activa-

---

1. "TEx." refers to an admitted Telemac Trial Exhibit.

tion and debit account funding functions. In one embodiment, the host processor takes the form of the personal computer illustrated in Figure 1 of the '100 patent. In another embodiment, the host processor either "comprises the central processing unit 14 of Fig. 1 or a satellite computer that is preferably connected to the central processing unit 14." (TEx.1, 8:15–19). A similar arrangement of multiple central and satellite host processors is illustrated in Figure 2 of the '418 patent which is incorporated by reference. In the case of the '418 patent, the multiple host processors include a central server and a plurality of satellite personal computers. Through these individual or multiple host processors, the system provider can communicate directly with the mobile telephone to activate and program the mobile telephone or to replenish the telephone's debit account. (April 27, 2001 "Order On Cross–Motions For Summary Judgment", p. 2–3; TEx. 1, '100 patent, Fig. 1, 1:15–18, 3:56, 6:7–9, 6:22–25; TEx. 5, Fig. 2, 5:5–40; Bristow Tr.[2], 80–81).

(6) The '100 patent specification discloses both "automatic" and "manual" embodiments for a system provider's host processors to communicate with a mobile telephone unit. The "automatic" embodiments include either direct "hard wire" or "over-the-air" data connections between the host processor and the mobile telephone unit. In both these automatic embodiments, the host processor enables the operation of the cellular phone by initiating communications and transmitting operating codes to the phone without human intervention. The manual approach, alternatively, requires the user to call an operator at the system provider's service center and verbally receive host processor activation codes from the operator. The user then manually enters these codes into the telephone through the telephone keypad. (TEx. 1, '100 patent; *Telemac Cellular Corp. v. Topp Telecom, Inc.*, 247 F.3d 1316, 1320 (Fed.Cir.2001)).

(7) The '100 patent discloses several structural embodiments for establishing a direct "hard wire" communication between a host processor and a mobile telephone unit. One of these embodiments involves an interlink receiver boot connected by wire to the host processor. The mobile telephone unit can be inserted into this interlink receiver boot to achieve a direct, electrical coupling with the host processor. In a second "hard wire" embodiment, "satellite processors for activating and programming phone units require only a personal computer with a modem and a bus connect to the connection port of the phone unit." (TEx.1, 3:56–59). This second "hard wire" embodiment achieves the same type of physical connection between the host processor and the mobile telephone unit. (TEx. 1, '100 patent, Fig. 1, 3:48–67, 8:36–38; *Telemac Cellular Corp.*, 247 F.3d at 1320; Bristow Tr. 73–76).

(8) The '100 patent's "over-the-air" automatic embodiments involve communication between a host processor and a mobile telephone unit over the airways through a Mobile Telephone Switching Office ('MTSO') transmission station. In these "over-the-air" automatic embodiments, the mobile telephone unit is programmed remotely, preferably "using cellular paging signals to establish the call, and Dual Tone Multi–Frequency ('DTMF') signals for communicating programming codes." *Telemac Cellular Corp.*, 247 F.3d at 1320. For example, in one of the '100 patent's over-the-air embodiments, as described in columns 6 and 18 of the '100 patent, the

---

**2.** "Bristow Tr." refers to that portion of the trial transcript reflecting the testimony of Telemac's technical expert Stephen Bristow.

Similar designations are used for the testimony of Robert Pye, Kenin Spivak, Shane Huang and Jonathan O'Neal.

mobile telephone unit uses its "paging capabilities" to speed dial the toll-free number of the host processor so that the telephone unit can be programmed in a direct communication link with the host processor using DTMF signals. (TEx. 1, '100 patent, 6:25–28, 18:15–18). In a different over-the-air activation and programming embodiment, as described in column 8 of the '100 patent, the user first dials up an operator at the system provider service center. In this embodiment, the host processor does not actually initiate the automatic communication link with the mobile telephone unit until the voice dialogue ceases and the telephone is switched to a "page mode." Once the telephone is in the "page mode," the host processor can send operating codes directly to the mobile telephone unit without any human involvement. (TEx. 1, '100 patent, Fig. 1, 4:18–32, 6:25–31, 14:14–22, 18:15–18; *Telemac Cellular Corp.*, 247 F.3d at 1320; September 6, 2000 "Order Construing Claims," p. 10–11; Bristow Tr. 84, 86–89).

(9) The '100 patent's automatic hard wire and over-the-air embodiments can be used for a variety of activation and programming purposes. These activation and programming purposes include: (1) having the telephone "programmed" with basic debit software, including code responsive to the host processor command set and the complex billing algorithm; (2) programming the telephone with a rate table to be used by the complex billing algorithm; and, (3) programming the telephone with NAM parameters, including the telephone's MIN (mobile identification number) and SID (site identification number). (TEx. 1, '100 patent, 2:58–61, 5:56–6:3, 6:32–39, 8:33–35 4:18–32, 6:25–31, 13:38–53,14: 14–21,; *Telemac Cellular Corp.*, 247 F.3d at 1325; "Order Construing Claims," p. 11–12; Bristow Tr. 97–100).

## C. THE USI DEBIT TELEPHONE SYSTEM

(10) USI, with its licensees such as Shared Technologies Cellular (Shared Technologies), Western Wireless, Sprint, Hikari, Brightpoint, Cellstar and Canquest, operate multiple debit telephone systems. In each of these debit telephone systems, cellular telephones are programmed with USI software to enable the telephones to: (1) store rate information for different types of calls within the telephone; (2) use a complex billing algorithm stored within the telephone to apply the appropriate rate to each call to determine the actual charges for the call; and, (3) use a debit account stored within the telephone to subtract charges for the call from a prepaid account amount. ("Order On Cross–Motion For Summary Judgment," p. 28–30; O'Neal Tr. 254–256).

(11) The debit telephone systems operated by USI and its licensees use computers to perform programming, activation and debit account funding functions. These computers are utilized as either USI programmed "production system" computers or USI programmed servers. Both production system computers and USI programmed servers can automatically program telephones using a direct machine-to-machine communication link. (O'Neal Tr. 223–285; Pye Tr. 17–55; Bristow Tr. 69–112; TEx. 35, USI "Dealer Manual").

(12) The USI "production system" computers are Intel based personal computers which have a "hard wire" bus connect from the computer's multi-port serial card to the connection port of each telephone unit. (O'Neal Tr. 254; Pye Tr. 18–19). Typically, there are several, individually identified cables coming out of the multi-port serial card. These cables can be connected to separate telephones. (Pye Tr. 19–20). Each production system computer is con-

nected to a data network so that it can communicate in real time with a USI server and/or be accessed by USI personnel. (O'Neal Tr. 234–235; Pye Tr. 19–20). All USI production system computers are programmed by USI with substantially the same software packages. (O'Neal Tr. 233). When a mobile phone is attached to the production system computer cable, the production system computer cable supplies the power needed to turn the telephone "on." (O'Neal Tr. 268–269; Bristow Tr. 77–78).

(13) The USI production system computers can program a variety of USI software and data into telephones, including: (1) USI's basic debit software, including USI's complex billing algorithm; (2) USI profile information, including rate tables, billing algorithm SIDs, billing algorithm wildcards and area code information; (3) NAM programming information, including the MIN telephone number and SIDs; and, (4) an initial debit account amount. (Pye Tr. 20–23, 54–55; Bristow Tr. 77; O'Neal Tr. 226, 254–259, 264). In order to program NAM parameters, an initial debit account amount and some types of profile information, the USI production system computer and a USI server must communicate with each other to coordinate the individualized programming and accounting information to be loaded onto a specific telephone. *Id.* In the case of USI's largest licensee, Shared Technologies, the production system computer and USI server have worked together to program mobile telephones with NAM parameters and profile information for about ninety-five percent (95%) of the telephones Shared Technologies has sold. (Pye Tr. 25, *see also* TEx. 197, Pye Declaration; TEx. 191, Bristow Communication Means Declaration).

(14) The process of programming phones using a USI production system computer starts with the computer operator choosing to operate the production sys-

tem computer either in an "online" mode, where a real time data connection is established with the USI server, or in an "offline" mode, where the USI production system computer can operate on its own. (O'Neal Tr. 227–228, 234–235; Pye Tr. 19–20). A production system computer cable is then plugged into the connection port on the phone unit. This cable both provides power to the telephone and establishes a communication link with the telephone. (Bristow Tr. 77–78). When the production system computer operator has selected the "online" mode and individualized information is needed for the programming process, the production system computer commands the mobile phone unit to provide electronic serial number (ESN) information. (O'Neal Tr. 229; Pye Tr. 23–24, 43; Bristow Tr. 79). The production system computer then communicates the ESN information retrieved from the telephone to the USI server. (Bristow Tr. 89; O'Neal Tr. 229; Pye Tr. 23–24). The USI server responds by sending a record containing the necessary individualized information back to the production system computer. This information includes NAM parameters or rate table profiles which are then programmed into the telephone. (O'Neal Tr. 264–265; Pye Tr. 24, 44; Bristow Tr. 80). The combination of ESN and NAM parameter information is unique for every phone being programmed. (Pye Tr. 24–25; O'Neal Tr. 269). The production system computer will take the individualized information and program it into the telephone through the correct bus connection. (O'Neal Tr. 227; Pye Tr. 25). The production system computer can also program more standardized software information, such as USI's basic debit software and generic "profile" information, into the telephones without going into the "online" mode. (O'Neal Tr. 227–228; *see also* TEx. 197, Pye Declaration; TEx. 191, Bristow Communication Means Declaration; TEx.

66, USI Proposal To Sprint, p. 16–17; O'Neal Deposition Transcript, p. 74–75; TEx. 189).

(15) Using the same USI server which is connected by a data network to USI's production system computers, USI and its licensees can also automatically program information into their mobile phone units "over-the-air." (O'Neal Tr. 226–227, 268–269; Pye Tr. 27). As in the '100 patent, USI's over-the-air automatic embodiments involve communication between the USI server and USI programmed mobile telephone units through a MTSO transmission station. (Pye Tr. 27; Bristow Tr. 84–85; TEx. 167). These USI over-the-air communication links have been used to program profile information, such as rate tables, and to fund the telephone's debit account. (Pye Tr. 31, 53; *see also* TEx. 197, Pye Declaration; TEx. 191, Bristow "Communication Means" Declaration; O'Neal Deposition Excerpts, p. 243–245; TEx. 60, USI's API Tool Kit Overview, p. 12–13; TEx. 35, USI's Dealer Manual, p. 11–12; TEx. 92, USI's patent application, p. 4, 35; TEx. 64, USI Competitive Analysis, p. 2–3).

(16) The USI over-the-air programming process starts with the user pressing a speed dial "MEM" key on the USI-programmed telephone to page the USI server. (Pye Tr. 28, 33–34; O'Neal Tr. 238–239). This is often done when the user wants to increase the funding in the phone's debit account. It can also be done when the USI phone is being initially programmed. *Id.* The USI server then initiates a two-party, over-the-air communication link with the USI programmed telephone by responding with DTMF "# 1" or "Do–Do" touch tones. The telephone recognizes server response as a distinctive form of negative acknowledgment or "NAK." (TEx. 92, USI patent application, p. 2; O'Neal Tr. 243–244, 247, 249, 278–279). The USI programmed telephone interprets these distinctive touch tones, in the first instance, as a command from the server to provide ESN identification information. *Id.* While the '100 patent also discloses a "NAK" command, USI's DTMF "# 1" or "Do–Do" touch tones are peculiar to the USI communication protocol. (*See* TEx. 1, '100 patent, 7:39). A telephone which is not programmed with USI software will not know how to interpret these distinctive touch tones and therefore cannot engage in a productive data dialogue with the USI server. (O'Neal Tr. 275–276). The USI server uses this ESN identification information to check its internally stored user records to see if the user's account has been "flagged" by USI's licensee to have new profile information, such as rate tables, programmed into the telephone. (Pye Tr. 29; Bristow Tr. 90–91, 95; O'Neal Tr. 239, 279). If the USI server detects such a "flag", it will automatically program the new profile information into the USI-programmed telephone—whether the user wants it or not. (Pye Tr. 29–30, 49; Bristow Tr. 90–91). The user is not involved in setting the flag in the USI server and has no choice about whether the flagged profile information will be programmed into the telephone. (Pye Tr. 29; Bristow Tr. 90–91; O'Neal Tr. 281, 283; *see also* TEx. 197, Pye Declaration; TEx. 191, Bristow "Communication Means" Declaration; O'Neal Deposition Excerpts, p. 243–245; TEx. 60, USI's API Tool Kit Overview, p. 12–13; TEx. 35, USI's Dealer Manual, p. 11–12; TEx. 92, USI's patent application, p. 4, 35; TEx. 64, USI Competitive Analysis, p. 2–3).

(17) The present dispute centers on claim one of the '100 patent, which describes:

A mobile phone system comprising a system provider having a host processor unit and a plurality of system users each

having at least one mobile phone wherein:

the host processor unit has communication means for selectively establishing a communication link with each mobile phone unit; and

each phone unit includes a processor, a clock chip, memory associated with the processor, program means including a complex billing algorithm and rate data for internally calculating call charges as calls are made, wherein the phone unit includes internal accounting means for generating a debit account with an account amount in the phone unit and decrementing the account amount in the debit account in real time, and wherein the system provider has payment verification means under system provider control for setting a phone use account amount and communicating the account amount to the phone unit, wherein the internal accounting means adds the account amount to the debit account.

(18) As previously noted, the sole remaining infringement dispute concerns whether USI or its licensees have or have had a host processor unit with "communication means for selectively establishing a communication link with each mobile phone unit".

### D. DAMAGES

(19) Telemac and USI are direct competitors in the business of licensing "switch independent" debit telephone technology to telephone companies, such as carriers and resellers, and to manufacturers. "Switch independent" refers to the fact that the billing software and debit account amount are programmed into the telephone, rather than residing at the network switch. Telemac and USI are the only direct competitors in this prepaid, switch-independent licensing field. (Spivak Tr., 136–137).

(20) Telemac has never licensed its technology to a direct competitor. (Spivak Tr., 147–148).

(21) If forced to license a direct competitor, Telemac would insist on a higher royalty rate than it had secured from non-competitor licensees. (Spivak Tr. 148–149; Huang Tr. 172–173).

(22) Both Telemac and USI obtain software revenues in the same manner. Both receive a percentage royalty on the debit account airtime sales made by their phone company licensees, and both receive a flat per phone fee from their phone company licensees and, in some cases, their manufacturer licensees. The percentage royalty which Telemac received from its phone company licensees for airtime sales generally ranged from four to twelve percent of the value of airtime downloaded. The flat per phone fee which Telemac received generally ranged between zero and twenty-five dollars. (Huang Tr. 168–178).

(23) USI began the debit telephone activities which are alleged to infringe the '100 patent in July, 1997. (Huang Tr., 163).

(24) Jonathan O'Neal, USI's chief technology officer, became aware of and read the '100 patent in November or December, 1996. (O'Neal Tr. 211, 214, 216).

(25) While developing the accused device, Mr. O'Neal made a good faith effort to avoid infringing the '100 patent. (O'Neal Tr. 219).

(26) To date, Telemac has spent between twenty and thirty million dollars to develop the technology described in the '100 patent. (Spivak Tr., 135–136).

(27) The '100 patent is one of Telemac's most valuable assets as a technology licensing company. (Spivak Tr., 133, 135–136).

(28) Telemac has lost significant business due to USI's introduction of its competing debit phone technology, which USI licensed at rates lower than Telemac's. Shortly after USI began marketing its debit phone software, one of Telemac's largest licensees, Shared Technologies, began also to license software from USI. Because USI's royalty rates were lower than Telemac's, Shared Technologies forced Telemac to lower its royalty rates for airtime downloaded onto Telemac-enabled phones from approximately 5.3 percent to between 4.2 and 4.5 percent. (Spivak Tr. 137–141; Huang Tr. 166–167; TEx. 15, Tab 10).

(29) Telemac was also damaged by the fact that MCI Worldcom chose to use USI's prepaid software in handsets offered by Shared Technologies. Because of this, Phillips, Telemac's sole handset manufacturer in the United States at the time, decided to stop manufacturing handsets for Telemac, thus effectively driving Telemac out of the prepaid phone market in the United States for that period of time. (Spivak Tr. 138–141).

(30) Telemac was also harmed when LG Infocom, a handset manufacturer, terminated licensing discussions with Telemac because its business partner, Sprint, initially chose to promote USI's debit software for use in CDMA digital phones produced by LG Infocom. (Spivak Tr. 141–143). Less than a year later, Sprint expressed interest in having Telemac-licensed phones produced by LG Infocom in addition to USI's. But in order to obtain Sprint's business, Telemac was forced to enter into licensing terms with Sprint at rates twenty to twenty-five percent lower than it normally charged for airtime royalties. Telemac was also required to forego any handset royalties or development fees from LG Infocom. (Spivak Tr. 143–145).

## II. CONCLUSIONS OF LAW

### A. CONCLUSIONS OF LAW REGARDING INFRINGEMENT

██ (1) The Federal Circuit has held that "in order for a court to find infringement, the plaintiff must show the presence of every element or its substantial equivalent in the accused device." *Zygo Corp. v. Wyko Corp.*, 79 F.3d 1563, 1568 (Fed.Cir. 1996) (citing *Lemelson v. United States*, 752 F.2d 1538, 1551 (Fed.Cir.1985)). To determine whether a patent is infringed, the court must interpret the claims of the patent, and the trier of fact must compare the properly construed claims to the accused device. *See Markman v. Westview Instruments, Inc.*, 52 F.3d 967, 976 (Fed. Cir.1995), *aff'd*, 517 U.S. 370, 116 S.Ct. 1384, 134 L.Ed.2d 577 (1996). "Infringement, both literal and under the doctrine of equivalents, is an issue of fact." *Southwall Technologies, Inc. v. Cardinal IG Co.*, 54 F.3d 1570, 1575 (Fed.Cir.), *cert. denied*, 516 U.S. 987, 116 S.Ct. 515, 133 L.Ed.2d 424 (1995). "The plaintiff has the burden of proving infringement by a preponderance of the evidence." *Kegel Co. v. AMF Bowling, Inc.*, 127 F.3d 1420, 1425 (Fed. Cir.1997).

██ (2) To determine whether an accused device literally infringes a means-plus-function claim element, such as the "communication means" claim element, a court must find identity of function between the claimed function and that of the accused device. *WMS Gaming, Inc. v. International Game Tech.*, 184 F.3d 1339, 1350 (Fed.Cir.1999). The court must also find that the accused device incorporates the same structure or a structure equivalent to that described in the specification as performing that function. *Telemac Cellular Corp.*, 247 F.3d at 1332.

██ (3) In ascertaining whether there are corresponding structure, material, or

acts, the court identifies only what structure, material, or acts are necessary to accomplish the recited function and ignores extraneous disclosure. *Wenger Manufacturing, Inc. v. Coating Machinery Systems, Inc.*, 239 F.3d 1225, 1233 (Fed.Cir.2001) ("Under § 112, ¶ 6, a court may not import functional limitations that are not recited in the claim, or structural limitations from the written description that are unnecessary to perform the claimed function."); *Chiuminatta Concrete v. Cardinal Industries*, 145 F.3d 1303, 1308–09 (Fed.Cir.1998) (structure "unrelated to the recited function" disclosed in the patent is irrelevant to 35 U.S.C. § 112, ¶ 6).

(4) Section 112 ¶ 6 requires that a "means-plus-function" claim element be given a range of structural equivalence. In this context, structural equivalence analysis is not undermined by the Federal Circuit's recent decision in *Festo Corporation v. Shoketsu Kinzoku Kogyo Kabushiki*, 234 F.3d 558 (Fed.Cir.2000). *See* Title 35 U.S.C. § 112 ¶ 6; *TM Patents, LLP v. International Business Machines Corp.*, 136 F.Supp.2d 209, 213 (S.D.N.Y.2001) ("Because structural equivalence under § 112(6) is NOT part of the 'doctrine of equivalence' implicated in Festo ... one can have literal infringement of a means-plus-function patent by a structure that is not identical to the disclosed embodiment—i.e., with an equivalent structure.")(emphasis in original) (citations omitted).

■ (5) Structural equivalence analysis applies to accused structures which perform a function identical to that claimed. This is distinct from the "doctrine of equivalents," which provides additional claim coverage for an accused function that is "substantially the same," but not identical, to that claimed. *TM Patents*, 136 F.Supp.2d at 213. The "doctrine of equivalents" is available to Telemac for the

"communication means" claim element because Telemac never made any "narrowing" amendment to the "communication means" claim element. *See Festo Corp.*, 234 F.3d at 566 (amendment must be "narrowing" to create estoppel). The only amendment which Telemac made to the "communication means" claim element during prosecution was to add the word "communication" before "means" to reiterate the already stated "communication" function. This amendment did not narrow the claim.

(6) The host processor's "communication means" function of "selectively establishing a communication link with each mobile phone unit" has been the subject of claim construction rulings by both this Court and the Federal Circuit. The Federal Circuit made its claims construction rulings in connection with Telemac's prior patent infringement action against Topp Telecom, Inc. *See Telemac Cellular Corp. v. Topp Telecom, Inc.*, 247 F.3d 1316 (Fed.Cir. 2001). Both this Court and the Federal Circuit have construed the "communication means" function to require that information be transmitted "automatically" between the host processor and mobile phone unit, that the host processor initiate the communication link, that the transmitted information be involved in the process of "activating and programming the customer's phone," and that the "means" be part of or controlled by the host processor. ("Order Construing Claims," p. 7–15; *Telemac Cellular Corp. v. Topp Telecom, Inc.*, 247 F.3d at 1324–1326); ("Order On Cross–Motions For Summary Judgment", p. 26–28).

(7) The host-processor-to-mobile-phone-unit communication must be "automatic" in that it must have a direct machine-to-machine communication link through which data is conveyed. There is no "automatic" communication means when "a user calls

the system provider's toll-free number and obtains activation codes from an operator, which the user enters manually." *Telemac Cellular Corp.*, 247 F.3d at 1322. "Communication means" does not encompass systems in which the user manually establishes communications with the host processor through a voice dialogue with a system provider operator. *Id.* at 1324. The fact that the system provider operator may use the host processor to check the electronic serial number of the mobile phone unit does not mean that the host processor "selectively establishes" an automatic communication link with the mobile phone unit. *See id.* at 1325. The fact that a human operator is conveying information to a human user means that there is no host processor selectively establishing a communication link with a mobile phone unit within the meaning of the '100 patent claims.

(8) The host processor must also "initiate" the communication link with the mobile phone unit. This host processor initiation requirement does not mean that the host processor itself must dial up the mobile phone unit at a time of the host processor's choosing. As this Court has previously noted, "the customer dialing the system provider is one of the means through which a communication between the host processor and the customer can be initiated." Yet, even when the user initiates the communication with the host processor by calling the system provider's 800 number, the actual communication link is initiated by the host processor when the host processor responds in a way which leads to a meaningful machine-to-machine dialogue with the telephone. (TEx. 1, '100 patent, 6:26–27, 18:17, 18:31; *Telemac Cellular Corp.*, 247 F.3d at 1331). In other words, when the host processor initiates transmission of recognizable signals to a mobile telephone unit within its system, it selectively establishes a communication link with that telephone unit. ("Order

Construing Claims," p. 10–11; TEx. 194, "Order On Cross–Motions For Summary Judgment", p. 26–27; Bristow Tr. 118).

(9) The "activation and programming" requirement means that the host processor must use the communication link to convey information to the mobile phone unit related to one of the "activation" or "programming" purposes recited in the '100 patent specification. As recognized by the Federal Circuit, "reprogramming the rate table" is an "activation and programming" purpose and meets the functional requirements of the "communication means" claim element. *Telemac Cellular Corp.*, 247 F.3d at 1325. Other "activation and programming" purposes recited in the '100 patent specification include programming the telephone with basic debit software, including the command set and the complex billing algorithm, and programming the telephone with NAM parameters, such as the telephone's MIN and SID. (Bristow Tr. 96–98). This construction of "activation and programming" is not only consistent with the teachings of the '100 patent but also consistent with the ordinary dictionary meaning of "activation" ("to make something functional") and "programming" ("to place data into a computer device").

(10) USI argues that "activation and programming" should be limited to placing NAM parameters within a telephone and then communicating those NAM parameters to a third party wireless service provider. This argument, however, does not take into account the critical distinctions between conventional cellular phones and the debit telephones of the '100 patent. In order to make the debit telephones of the '100 patent active for general use, debit software, such as the complex billing algorithm, must be programmed into the telephone. A rate table must also be programmed into the telephone and a debit account must be set up.

None of these additional programming steps are required for conventional cellular telephones. The '100 patent, therefore, requires a broader understanding of "activation and programming" than would be required for a conventional cellular phone. (Bristow Tr. 96–97).

(11) Moreover, USI's arguments are inconsistent with the claim construction rulings made by this Court and affirmed in the Federal Circuit. In *Telemac Cellular Corp.*, the Federal Circuit characterized "reprogramming the rate table" as an example of activation and programming. USI's definition of activation and programming would not encompass reprogramming the rate table and, therefore, is narrower than the claim requires. In addition, to the extent USI defines "activation" as a communication link to a third party wireless service provider, this definition does not satisfy the "communication means" requirement of a direct communication link between the system provider host processor unit and the mobile phone unit. The '100 patent explicitly states that the system provider "may be an entity different from the wireless service provider." (TEx. 1, '100 patent, 5:12–13, 20:31–33).

(12) There are three structural embodiments found in the '100 patent specification that meet all the functional requirements of a "communication means" for a host processor to "selectively establish a communication link" with a mobile phone.

(13) The first of these "communication means" embodiments, as noted by the Federal Circuit, is the "hard wire" embodiment of column 3. In the "hard wire" embodiment, the phone unit is "physically connected" to the host processor. Activation and programming of the phone "is performed using an interlink receiver for machine-to-machine communications, thereby ensuring a secure transfer of information." *Telemac Cellular Corp.*, 247 F.3d at 1325. In the same column 3 section of the '100 patent cited by the Federal Circuit to identify this "hard wire" embodiment, the '100 patent states that the host processor can take the form of a satellite "personal computer," where the interlink receiver is replaced with a hard wire "bus connect to the connection port of the phone unit." (TEx. 1, '100 patent, 1:53–59).

(14) Columns 4, 6 and 14 of the '100 patent describe a second "communication means" embodiment. "The '100 patent describes the over the air updating of the rate table 'at the initiation of the system provider'" and "describes a transmission station for establishing a wireless link to the mobile phone for reprogramming the rate table over the air at the initiation of the host processor." *Id.* This rate table reprogramming may be initiated by the host processor either through off-hours polling or, "[p]referably, the updated rate table is coded when the user applies for an increase in the internal phone account." (TEx. 1, '100 patent, 14:14–21).

(15) The third and final "communication means" embodiment requires that the user push a speed dial button on the telephone to page an operator at the system provider service center. After a short voice dialogue, the switch is made to so-called "page mode," so that the phone will be ready to receive DTMF commands from the host processor. ("Order Construing Claims," p. 10–11; TEx. 1, '100 patent, 8:24–32). A direct machine-to-machine communication link is then established between the host processor and the mobile phone unit over the same voice channel "when the user-initiated voice dialogue ceases." *Id.* "At that point, the communication link is initiated by the host." *Id.* Structurally, the second and third "communication means" embodiments are the same in the sense that they both involve the same over-the-air technology.

(16) If the debit telephone system used by USI and its licensees corresponds to any one of these multiple embodiments, infringement is established. *Micro Chemical, Inc. v. Great Plains Chemical Co., Inc.*, 194 F.3d 1250, 1258 (Fed.Cir.1999) ("Because alternative structures corresponding to the claimed function were described, the district court incorrectly limited 'weighing means' to the specific structures of the preferred embodiment."); *Serrano v. Telular Corp.*, 111 F.3d 1578, 1583 (Fed.Cir.1997) ("Disclosed structure includes that which is described in a patent specification, including any alternative structures identified.") (citations omitted).

■ (17) The debit telephone systems operated by USI and its licensees use all three of the "communication means" embodiments. In each case, a USI host processor initiates an automatic communication link with the mobile phone unit using host-processor-controlled means for purposes related to activation and programming.

(18) The "production system" computer structure used by USI and its licensees to perform the required "communication means" function is identical to the "hard wire" embodiment described in columns 3 and 8 of the '100 patent specification. As described in column 3 of the '100 patent specification, USI uses a "personal computer" specializing in "activating and programming phone units" as its production system host processor. The USI production system personal computer has "a modem and a bus connect to the connect port of the phone unit" exactly as described in column 3 of the '100 patent specification. (TEx. 1, '100 patent, 3:54–59; Bristow Tr. 70–71). In column 8, the '100 patent teaches that the "host computer" can either take the form of a "central processing unit 14 which acts as a hub for system wide coordination of accounting" information "or a satellite computer" of the type described in column 3 and used in USI's production system for "activating and programming phone units." (TEx. 1, '100 patent, 3:54–59, 8:15–19). The '100 patent specification states that this activation and programming satellite computer is "preferably connected" to the central processing unit (e.g., the USI server). However, by using the word "preferably," the '100 patent teaches that even if the USI "satellite" production system computer is not "connected" to the USI server, it still would be within the scope of Telemac's invention (i.e., a less preferred, alternative embodiment).

(19) The "hard wire" communication link which the USI production system host processor establishes with the mobile phone unit is host processor initiated, automatic and relates to activation and programming functions. Selectivity is achieved in the USI production system by connecting a single identifiable cable from the USI production system host processor to a mobile phone unit. As in the '100 patent, the "activation and programming" functions performed with the USI production system include programming USI's basic debit software (including USI's complex billing algorithm), programming "profile" information (such as rate tables and billing algorithm SIDs), and programming NAM parameters. The performance of any one of these "activation and programming" functions by the USI production system host processor is sufficient. For these reasons, the production system host processors used by USI and its licensees to program telephones have host processor communication means for selectively establishing a communication link with each mobile phone unit within the meaning of claim 1 of the '100 patent.

(20) USI argues that its production system computers do not use "communication

means" because the USI servers, not the USI production system computers, are the "host processors" within the meaning of claim 1 of the '100 patent. However, by using the open-ended transitional phrase "comprising" and the indefinite article "a" before its first recitation of the claim element "host processor unit," claim one of the '100 patent covers one or more host processor computers. *Crystal Semiconductor Corp. v. TriTech Microelectronics International, Inc.,* 246 F.3d 1336, 1347 (Fed.Cir.2001) ("This court has consistently emphasized that the indefinite articles 'a' or 'an,' when used in a patent claim, mean 'one or more' in claims containing open-ended transitional phrases such as 'comprising'. . . . Under this conventional rule, the claim limitation 'a,' without more, requires *at least one.*") (citations omitted) (emphasis in original); *KCJ Corp. v. Kinetic Concepts, Inc.,* 223 F.3d 1351, 1356 (Fed.Cir.2000) (same).

(21) The '100 patent explicitly teaches that the "host computer comprises the central processing unit 14 of FIG. 1 or a satellite computer" of the type used by USI and its licensees in their production systems. So long as the satellite USI production system computer establishes a communication link with the mobile phone unit and uses that communication link to perform at least one activation or programming function, the USI production system computer satisfies the requirements for the "communication means" claim element. The USI production system computer meets all the structural and functional requirements for the "communication means" claim element. There is no requirement in the '100 patent specification or its claims that any one host processor perform all of the tasks described in the '100 patent specification.

(22) Moreover, because USI's production system computers are all linked by data network to USI and its servers, the USI production system computers can be considered to be part of the same host processor computer system. Regardless of whether the operator chooses to operate the USI production system computer in the "offline" or "online" mode, the USI production system computer is still capable of operating in an "online" mode which gives it full access to USI and USI's server database. *See Intel Corporation v. U.S. International Trade Commission,* 946 F.2d 821, 832 (Fed.Cir.1991) ("[T]he accused device, to be infringing, need only be capable of operating in the page mode. Contrary to GI/M's argument, actual page mode operation in the accused device is not required."). As previously noted, while the '100 patent specification teaches that a satellite production system computer of the type used by USI and its licensees is "preferably connected" to the central processing unit server, the '100 patent also teaches that such a connection is not required. Nor does the patent require that any such connection be in an "online" mode. (TEx. 1, '100 patent 8:15–19).

(23) The "over-the-air" structure used by USI and its licensees to perform the "communication means" function is also identical to that described in columns 4, 6, 8 and 14 of the '100 patent specification. As described in the '100 patent, USI's over-the-air automatic embodiments involve direct communication between the USI server and USI-programmed mobile telephone units through an MTSO transmission station. This over-the-air USI communication link is automatic because it transmits data directly from the USI server to a USI-programmed phone without any human voice dialogue. The over-the-air USI communication link is also host processor initiated because the signal transmitted by the host processor initiates meaningful machine communication to telephones programmed with USI software. (Bristow Tr. 86–89, 110–111). This

over-the-air USI communication link is used for "activation and programming" purposes such as downloading profile information and reprogramming of rate tables. (Bristow Tr. 89–90). When rate table reprogramming is done, the rate table communication is initiated by the USI server without the permission, or even the knowledge, of the telephone user, in the same way described in the preferred embodiment of the '100 patent specification. (TEx. 1, '100 patent, 14:19–21). For these reasons, the servers used by USI and its licensees to program telephones over-the-air have host processor communication means for selectively establishing a communication link with each mobile phone unit within the meaning of claim 1 of the '100 patent.

(24) USI argues that the USI server does not "initiate" the communication link because it is the user who pushes a MEM key to dial up the host processor. However, the question is not who dials up whom, but who initiates the establishment of an automatic communication link which allows the electronic transmission of meaningful data. Even when the USI-programmed mobile phone unit dials up the USI server, the communication link is still host processor initiated and established because the USI server transmits a signal which leads to a meaningful machine-to-machine dialogue with the USI-programmed phone. It is clear from the trial testimony that a phone which is not programmed with USI software cannot engage in a meaningful machine-to-machine dialogue with the USI server because it would not recognize the USI server's distinctive DTMF "# 1" or "Do–Do" touch tones as being a command to provide ESN information and engage in a productive dialogue with the USI server. (O'Neal Tr. 247, 249, 275–276; TEx. 92, USI patent application, p. 2). It is therefore the USI server which initiates the selective establishment of a communication link for phones programmed with USI software.

(25) Because USI and its licensees use both the "hard wire" and "over-the-air" automatic communication means disclosed and claimed in the '100 patent and there are no other claim elements in dispute for infringement purposes, this Court concludes that USI has infringed claims 7, 10 and 11 of the '100 patent.

## B. CONCLUSIONS OF LAW REGARDING DAMAGES

(26) Telemac is entitled to "damages adequate to compensate for the infringement, but in no event less than a reasonable royalty." 35 U.S.C. § 284; *Hanson v. Alpine Valley Ski Area, Inc.,* 718 F.2d 1075, 1077 (Fed.Cir.1983). The purpose of the damage award is to place the patent owner in the same financial position it would have been in had the infringement not occurred. *Aro Mfg. v. Convertible Top Replacement Co.,* 377 U.S. 476, 507, 84 S.Ct. 1526, 12 L.Ed.2d 457 (1964); *Rite–Hite Corp. v. Kelley Co.,* 56 F.3d 1538, 1545 (Fed.Cir.1995).

(27) A patent owner need not prove patent infringement damages with absolute certainty. Damages need only be proven by a preponderance of the evidence, and the patent owner's burden of proof is one of reasonable probability. *Kori Corp. v. Wilco Marsh Buggies & Draglines, Inc.,* 761 F.2d 649, 653–54 (Fed. Cir.1985).

(28) As the Federal Circuit has expressly recognized, reasonable royalty analysis "necessarily involves an element of approximation and uncertainty." *Unisplay S.A. v. American Elec. Sign Co.,* 69 F.3d 512, 517 (Fed.Cir.1995). Because the computation of damages is not always amenable to precise determination, it will be sufficient where the evidence shows

"the extent of damages as a matter of just and reasonable inference, although the result be only approximate." *Paper Converting Machine v. Magna–Graphics,* 745 F.2d 11, 22 (Fed.Cir.1984); 35 U.S.C. § 284; *Hanson,* 718 F.2d at 1077. Any uncertainty in calculating a damages award is to be resolved against the infringer. *Sensonics, Inc. v. Aerosonic Corp.,* 81 F.3d 1566, 1572 (Fed.Cir.1996).

■■■ (29) The starting point for a reasonable royalty analysis is assessing the amount the parties would have agreed to in a hypothetical licensing negotiation between a willing licensor and a willing licensee. *Stickle v. Heublein, Inc.,* 716 F.2d 1550, 1561 (Fed.Cir.1983). The parties are presumed to be reasonable and prudent business persons who are trying to reach an agreement. *Georgia–Pacific Corp. v. United States Plywood Corp.,* 318 F.Supp. 1116, 1120 (S.D.N.Y.1970), *modified and aff'd,* 446 F.2d 295 (2d Cir.1971).

(30) *Georgia–Pacific* sets forth fifteen factors the courts generally consider in a reasonable-royalty analysis. These factors are:

(1) The royalties received by the patentee for licensing the patent-in-suit, proving or tending to prove an established royalty;

(2) The rates paid by the licensee for the use of other patents comparable to the patent-in-suit;

(3) The nature and scope of the license, as exclusive or nonexclusive; or as restricted or unrestricted in terms of territory or with respect to whom the manufactured product may be sold;

(4) The licensor's established policy and marketing program to maintain his patent monopoly by not licensing others to use the invention or by granting licenses under special conditions designed to preserve the monopoly;

(5) The commercial relationship between the licensor and licensee, such as whether they are competitors in the same territory in the same line of business or whether they are inventor and promoter;

(6) The effect of selling the patented specialty in promoting the sales of other products of the licensee, the existing value of the invention to the licensor as a generator of sales of his nonpatented items and the extent of such derivative or convoyed sales;

(7) The duration of the patent and the term of the license;

(8) The established profitability of the product made under patent, its commercial success and its current popularity;

(9) The utility and advantages of the patent property over the old modes or devices, if any, that have been used for working out similar results;

(10) The nature of the patented invention, the character of the commercial embodiment of it as owned and produced by the licensor and the benefits of those who have used the invention;

(11) The extent to which the infringer has made use of the invention and any evidence probative to the value of that use;

(12) The portion of the profit or of the selling price that may be customary in the particular business, or in comparable businesses, to allow for the use of the invention or analogous inventions;

(13) The portion of the realizable profit that should be credited to the invention as distinguished from non-patented elements, the manufacturing process, business risks, or significant features or improvements added by the infringer;

(14) The opinion of qualified experts;

(15) The amount that a licensor (such as a patentee) and a licensee (such as an infringer) would have agreed upon (at the time the infringement began) if both

had been reasonably and voluntarily trying to reach an agreement; that is, the amount which a prudent licensee—who desired, as a business proposition, to obtain a license to manufacture and sell a particular article embodying the patented invention—would have been willing to pay as a royalty and yet be able to make a reasonable profit and which amount would have been acceptable by a prudent patentee who was willing to grant a license.

*Georgia–Pacific*, 318 F.Supp. at 1121.

■ (31) Where an established royalty exists, it is usually the best measure of what constitutes a reasonable royalty. *Nickson Indus., Inc. v. Rol Mfg. Co., Ltd.*, 847 F.2d 795, 798 (Fed.Cir.1988).

■ (32) A patent owner may, in the alternative, recover actual damages for price erosion by showing that the infringement caused the patent owner to charge lower prices than the market would otherwise have dictated. *Amstar Corp. v. Envirotech Corp.*, 823 F.2d 1538, 1543 (Fed.Cir. 1987); *Hanson*, 718 F.2d at 1078. Price erosion damages can be described as "the difference between actual costs of goods and potential price—the price [that the patent holder] could have realized had there been no competition from the infringers." *In re Mahurkar Double Lumen Hemodialysis Catheter Patent Litig.*, 831 F.Supp. 1354, 1386 (N.D.Ill.1993). To recover price erosion damages, the patent holder must show that it would have been able to charge higher prices but for the infringement. *Minco, Inc. v. Combustion Eng'g, Inc.*, 95 F.3d 1109, 1120 (Fed.Cir. 1996), and it must prove the amount of its loss. *Lam, Inc. v. Johns–Manville Corp.*, 718 F.2d 1056, 1065 (Fed.Cir.1983). The patent owner's burden of proof on these issues is only to a reasonable probability. *Yarway Corp. v. Eur–Control USA, Inc.*, 775 F.2d 268, 275 (Fed.Cir.1985). The determination of price erosion damages is

not expected to be exact. It is enough if the evidence shows that the damages are a matter of just and reasonable inference even though the result is only approximate. *King Instr. Corp. v. Otari Corp.*, 767 F.2d 853, 863 (Fed.Cir.1985).

(33) The period of infringement for calculating damages is from July, 1997 to the date of the judgment.

(34) The Court is unable to determine the actual damages caused by USI's infringement of the '100 patent. The Court will therefore award a reasonable royalty rate. 35 U.S.C. § 284; *Beatrice Foods Co. v. New England Printing and Lithographing Co.*, 899 F.2d 1171, 1173 (Fed.Cir.1990) ("Damages ... are usually measured, depending on the circumstances and the proof, as the patent owner's lost profits or as a reasonable royalty."); *Mahurkar v. C.R. Bard, Inc.*, 79 F.3d 1572, 1580–81 (Fed.Cir.1996) (holding that district court erred in awarding measure of lost profits in addition to reasonable royalties).

(35) Telemac seeks reasonable royalty damages based on applying a dollar-per-unit royalty rate to USI's sale of infringing handsets manufactured or sold in the United States, and applying a percentage royalty rate to the value of the airtime downloaded into infringing handsets.

(36) The Court has reviewed the *Georgia–Pacific* factors relevant to a reasonable royalty determination, and accepts the analysis of those factors set forth in the Expert Report of Shane Huang and Roy Weinstein (TEx.15), the Declaration and Supplemental Expert Report of Shane Huang (TEx.192), and in the trial testimony of Shane Huang (Huang Tr., 165; 172–174; 177–178). It is particularly relevant to the *Georgia–Pacific* analysis that Telemac would not have willingly licensed a direct competitor such as USI and, if forced to do so, would only have licensed USI at the highest possible royalty rate it

could obtain (Spivak Tr., 147–150; Huang Tr. 172–173; 177–178). In effect, in order to license a direct competitor, Telemac would have required significantly higher royalty rates to compensate it for the risks of quality, fraud and general price erosion caused by USI. (Spivak Tr. 148–149). This fact weighs in favor of applying a higher reasonable royalty rate for USI's infringing activity than that applied to Telemac's non-competitor licensees.

(37) Based on this review and consideration of all evidence presented at trial, Telemac is entitled to a three dollars per-unit royalty on all USI handsets sold or manufactured in the United States and a ten percent royalty rate applied to the value of all airtime downloaded into infringing handsets during the infringing period. These are the reasonable royalty rates calculated by Telemac's damages expert, Mr. Huang. (Huang Tr., 164–166). USI has not presented any evidence which conflicts with Mr. Huang's calculation of reasonable royalty rates.

(38) Based upon Mr. Huang's calculations, the total amount of reasonable royalty damages Telemac suffered due to USI's infringement of the '100 patent since July, 1997 is approximately $7,428,250.00, including prejudgment interest. (Huang Tr., 163–168).

(39) Mr. Huang testified that approximately 81.5% of all such handset and airtime sales during the damages period could be attributed to Shared Technology's phones, resulting in approximately $5,222,129.00 in reasonable royalty damages calculated on these sales alone, including prejudgment interest (Huang Tr., 330–331).

(40) It is within the Court's discretion to award up to treble damages where infringement has been willful. *Rosemount, Inc. v. Beckman Instruments, Inc.*, 727 F.2d 1540, 1547–48 (Fed.Cir. 1984). Willfulness must be established by clear and convincing evidence. *SRI Int'l, Inc. v. Advanced Technology Laboratories, Inc.*, 127 F.3d 1462, 1465 (Fed.Cir.1997).

(41) The Court must look to the totality of circumstances in determining willfulness, including (1) whether the infringer deliberately copied the patentee's ideas; (2) whether the infringer knew of the plaintiff's patent protection, investigated the scope of the patent and formed a good faith belief that it was invalid or that it was not infringed; and, (3) the infringer's litigation behavior. *Bott v. Four Star Corp.*, 807 F.2d 1567, 1572 (Fed.Cir.1986). "[A]ttempts to design around and avoid the patent or any other factors tending to show good faith, should be taken into account and given appropriate weight." *SRI Int'l*, 127 F.3d at 1465.

(42) Based upon the totality of the circumstances, including USI's good faith belief that it was not infringing the patent, and USI's effort to design around the '100 patent to avoid infringement, the Court finds that Plaintiff has not shown, by clear and convincing evidence, that USI's infringement was willful.

(43) Prejudgment interest should ordinarily be awarded where infringement is found. *General Motors, Inc. v. Devex Corp.*, 461 U.S. 648, 655, 103 S.Ct. 2058, 76 L.Ed.2d 211 (1983). Prejudgment interest runs from the date the infringement commences to the date of judgment. *Nickson Indus.*, 847 F.2d at 800.

(44) The Court finds that Telemac is entitled to prejudgment interest based on the one-year Treasury bill rates during the period of infringement, which is the reasonable measure of prejudgment interest calculated by Telemac's damages expert, Mr. Huang. (TEx. 192, Tab 12).

(45) Based upon the applicable case law and the evidence presented at trial, the

Court finds that USI has damaged Telemac in the amount of $7,428,250 million for USI's infringement of the '100 patent.

(46) Pursuant to stipulation of the parties and to this Court's Order, any actions taken by Pre–Cell Solutions, Inc. (Pre–Cell) or Prepaid Solutions, Inc. (Prepaid) on or after April 5, 2000 in concert with USI or involving USI's accused technology may be imputed to USI as if they were done by USI itself, for purposes of proving liability. Pre–Cell and Prepaid also have agreed to be jointly and severally liable with USI for any judgment entered against USI, including any damages assessed against USI. Pre–Cell and Prepaid have also agreed to be bound by the terms of any injunction entered against USI in this action. (TEx.22)

(47) As the prevailing party, Telemac is entitled to an award of its reasonable costs and may apply for further relief, including a permanent injunction, within thirty days of the date of this order. If Telemac fails to apply for additional relief within thirty days, judgment shall enter according to the terms of this order.